UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| James Adams, Joyce Adjei, Jimmie Ahlström, Hiren Aka Montu Govindbhai Patel, Yakup Alici, Krasthorn Alongkornrasmee, Eric Andersen, Michele Irene Arauz Castillo, Kevin Austin, Marc Aymerich, Chetan Bafna, Frank Bakker, Derek Barss, Claudio Bärtschi, Michael Bauer, Florian Beck, Will Beinert, Christina Berta, Christopher Botto, Taylor Donald Brinton, Stephen Bruchet, Claire Brynycz, Kyle Burklund, Richard Buteyn, Hila Cage Coppola, Jeroen Campfens, Alpha Camps Dao, Marco Cantarutti, Keyshawn Carr, Cole Caudill, Pak Ho Ambrose Chan, Virapong Chandarasanti, Wilson Chin, Bernie Chiv, Alfie Chow, Michael Clarke, Maxime Coin, Mahius Concord, Chevrolet Cruz, Gabi Dagher, Haithem Dakhli, Finley Dale, Andrew Dalecki, Brody Daniels, Juan Carlos De Llano, Simon Dent, James Devlin, Jayden Di Palma, Akryd Institut Digital, Guillaume Dubost, Dennis Duncan, Albert Duncan, Eduardo Elizondo, Samrat Eltepu, Samrat Eltepu, Michael Enriquez, Kenneth Gamble, Timothy Gary, Massimo Gasparini, Stefan Gasselseder, Buta Cosmin Gheorghe, Shanjan Kumar Gnanasekar, Shanjan Kumar Gnanasekar, Tim Goddard, Glenn Gordon, Rory Graman, Tim Grice, Deann Haist, Todd Hallam, Jason Haskell, Jason Haskell, Ashley Hautman, Michael Hazilias, Benjamin Heimann, Levi Hendrickson , Greg Hernacki, Ryan Hodder, Ryan Hodder, Joel House, Seth House, Tasnuva Huda, Darshan Jalan, Foo Jee Ming, Jay Johansen Lim, Jordache Johnson, Bradley Kamieniarz, James Karavas, Rachael Kay, Rachael Kay, Daman Khaihra, Poovanut Khamhaeng, Mohammad Khan, Mohammad Khan, Felix Kilga, Travis Kohler, Jonas Kolberg, Dominick La Spisa, Michael La Spisa, Lewis Langer, Marwan Laugier, Fernando Leal, Shaun Leggett, Daniel Lestarge, Johan Levaniants, Xiaotian Lin Lin, Michael Lord Microbilo Smith, Jack Louis, Aaron Lowe, Farah Manley, Aaron Markham, Pedro Martins, Duane Mateski, Sean Matthys, Darren Mattock, Marcus Maxwell, Colton Mccoy, Blake Mcelmurry, Mike Mcguire, Johannes Meger, Georgi Merazchiev, Nicholas Mercier, Stephan Michels, Adrian Militaru, Casey Miller, Ivan Mladenovic, David Mooney, Christopher Morel, Christopher Morel, Ajeesh Mulavinal Mathew, Evan Murphy, Taito Myllynen, Glen Naughton, Carlos Navarro, Collin Neitzel, Charles Neitzel, Alessandro Nery, Nathan Nguyen, Michał Nguyen Van, Michał Nguyen Van, Colton Nimz, Wesley Clarence Sy O, Brian Daniel Ochs, Colin Ogorman, Chun Seng Ong, Raymond Ong, Christian Oppl, | Case No.: <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Dipak Pandey, Dimitrios Papaioannou, Andrei Paraschiv, Mark Pearce, Mark Pearce, Egor Pelevkin, Egor Pelevkin, Wouter Peters, Georgios Petrou, Andreas Pierrou, Keith Pillsbury, Caroline Poisson, Harry-Antony Poulos, Harry-Antony Poulos, David Poynter, Christian Poynter, Stephen Poynter, Ivan Rajcic, Jhojan Eliecer Ramirez Beltran, Amit Rathod, Amit Rathod, Gavin Rennie, Joyal Rodrigues, Marc Rogers, Nelson Rosales, Mantas Ryzakovas, Sudhanshu  Sachan, Dheeraj Sanjeev, Sean Santos, Anisha Keshav Sarin, Marc Sedillo, Paul Shuen Hwa Seo, Paul Shuen Hwa Seo, Khurram Shah, Balazs Sinka, Raphael Soh, Michael Sparks, Nathan Spencer, Nathan Spencer, Timo Sprotte, Timo Sprotte, Zachary Staudt, Andrew Steedman, Mark Steen, Jason Steen, Jason Steen, Christian Steffey, Clark Stewart, Yvo Stoots, Ryan Stout, David Street, Jonathan Succar, Sujith Sugathan, Rateb Suleiman, Mitchell Sun, Madhav Sunil Nath, Abdullah Swailimyeen, Sam Tait, Nicholas Tan, Nicholas Tan, Tim Taylor, Alexander Simon Templeton, Samuel Thompson, Gregory Tiffany, Dikran Tokat, Wiljan Torrefiel, William Torrens, Daniel Trabold, Alvin Him Kheng Tung, Michael Tyler, Elaine Upton, Tamar Van Der Haas, Tamar Van Der Haas, Sander Van Der Vegte, Marta Vegas Coletas, Alexis Viprey, Edward Vonallmen, Jordan Wadsworth, Vaibhav Wankhedkar, Cory Watkins-Suzuki, Katie Whitaker, Maciej Wilk, Maciej Wilk, Benjamin Wojcik, Craig Zadrapa, Muhammad Waqas Zaman, and Adil Ziad,

Plaintiffs,

v.

Guillermo Gharib, Ashley Harris, Cyrus Abrahim, James Abbos Binaiz, Peter McInnes, Nicholas Schmidt, and Oliver Wood,

Defendants.

# TABLE OF CONTENTS

OVERVIEW ............................................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 3

PARTIES ................................................................................................................... 5

    Plaintiffs ................................................................................................................ 5

    Defendants .......................................................................................................... 16

FACTUAL ALLEGATIONS .................................................................................... 17

    The Origins of the TradeAI Project ................................................................... 17

    The Growth of TradeAI and the Development of Pools Led By KOL Promotors ................. 25

    On Chain Buccaneers, the Ship, Jampzer and Hydraze .................................... 27

    Members of OCB Had a Long Relationship with the UA3 Team ...................... 32

    TradeAI Continued to Grow on a Rocky Path Until Its Collapse in October 2023 ................. 33

    The TradeAI Team Converts to the StakX Syndicates to Ensure the Scheme Continues ........ 41

    The StakX Syndicates Continued to Face Payout Problems and Eventually Failed ............... 48

    The Securities Subject to Regulation Under the Securities Act .......................... 51

        The Securities Involved a Common Enterprise .............................................. 52

        The Securities Were Sold and Purchased With the Expectation of Profits from the Efforts of Others ......................................................................................... 54

        The Sale and Purchase of the Securities Took Place in the United States ........ 55

CAUSES OF ACTION ............................................................................................. 55

    Count I ................................................................................................................. 55

    Count II ............................................................................................................... 58

PRAYER FOR RELIEF ........................................................................................... 61

JURY DEMAND ...................................................................................................... 61

Plaintiffs (as defined below), by and through their attorneys, allege the following upon information and belief, except as to allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, Plaintiffs' counsel's investigation, which includes, without limitation, review and analysis of news articles, websites, other publicly available information concerning the Defendants, TradeAI, and StakX (as defined below).

## **OVERVIEW**

1.      This is about a cryptocurrency Ponzi scheme that exploited elements of traditional multi-level marketing programs to solicit and collect over $440 million in investments within a single year.  The scheme unfolded across two distinct phases: the "TradeAI" period and the subsequent "StakX" period. Each phase presented investors with promises of extraordinary returns—as high as a 25% return or more in seven days—underpinned by misrepresentations and a network of trusted promoters who leveraged their reputations to drive the flow of investments.

2.      During the initial TradeAI period, Defendants enticed Plaintiffs to invest substantial digital assets into high-yield cryptocurrency investment pools. Defendants promised that Defendant Gharib—a supposed "genius-level trader"—managed these pools and would deliver unparalleled returns with little risk. Investors were assured of consistent profits while their funds were purportedly traded using proprietary algorithms and strategies. The operation flourished until TradeAI suddenly collapsed, locking Plaintiffs' investments in Defendants' accounts.

3.      After failing to make payments to investors, the operators of TradeAI attributed the delays to alleged corporate-level issues, problems with the accounts, and broader infrastructure challenges. To address these purported issues, the TradeAI quickly pivoted, launching a new investment vehicle called StakX within weeks.  Investors were told that the method for investing

had changed, and now instead of investment pools they would send their money directly to "syndicates" for trading. However, the promise of high-yield returns based on Defendant Gharib's lauded trading strategies remained central. This shift was a thinly-veiled attempt to prolong the scheme, giving the appearance of innovation while concealing the systemic problems at its core. Just like before, Plaintiffs and other investors invested substantial amounts of digital assets in these syndicates with the promise of substantial earnings. Just like before, these vehicles suddenly stopped functioning, and Plaintiffs and other investors lost millions of dollars.

4.     Amazingly, the supposedly genius investment trader that consistently generated above-market returns admitted to one of the Plaintiffs that the entire TradeAI and StakX operation was a Ponzi scheme. Therefore, every statement that the promised returns were the result of a trading strategy were false.

5.     Throughout the entire scheme, the Plaintiffs lost more than $20 million between investments in NFTs to access the investment pools, their investments in TradeAI investment pools, and their investments in StakX syndicates.

6.     This project was only possible due to the direct involvement of several high-profile individuals within the cryptocurrency community. These individuals, often regarded as influential traders, social media influencers, or key opinion leaders ("KOLs") in the crypto world, leveraged their platforms and the trust of their followers to recruit participants. By exploiting their reputations and community standing, these promoters played an instrumental role in driving investment into a scheme they knew, or should have known, was scheme.

7.     By promoting and selling these securities, and by reassuring the Plaintiffs and other investors that these were safe investments without divulging the fact that they were actually Ponzi schemes, Defendants violated Sections 12(a)(1), 12(a)(2), and 15 of the Securities Act.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 77v, which vests jurisdiction for claims under the Securities Act in U.S. District Courts.

9.    This Court has personal jurisdiction over each of the Defendants because each either has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v because the Defendants transact business in this District, and/or many of the acts charged herein occurred in substantial part in this District.  For example, many of the digital assets that are at issue in this litigation—specifically, the Non-Fungible Tokens ("NFTs")—were listed and sold on the online exchange OpenSea.io, which is headquartered in this District, in New York, NY.  Furthermore, most of these NFTs were selected as "verified" accounts by OpenSea.io, given them further legitimacy.  OpenSea.io received a percentage of the sale price of every NFT listed on its platform, meaning that a portion of every sale was sent to this District.  A description of relevant NFTs is attached as Exhibit A.

11.    Furthermore, the events were promoted largely through websites such as Twitter (now known as X) and Discord, which are headquartered and located in San Francisco, California, and are accessible in this District.  Many of the websites used in the promotion of the digital assets at issue were registered in the United States.  Defendants specifically marketed the products to United States citizens and promoted the use of United States-based exchanges.  At least one Plaintiff also made purchases or investments in this District.

12.    Discord is a service that is particularly popular within the crypto and web3 communities in part because it has developed website integrations that are specific to the digital

asset community.  For example, community managers can verify that digital assets are held in wallets.[1]  Discord servers can also be deleted easily and quickly, which has happened to many of the Discord servers discussed in this matter.

13.    Defendants also used the website Vercel.app, which is headquartered in San Francisco, California, to effectuate the TradeAI scheme.  *See, e.g.*, https://claim-report-tradeai.vercel.app, archived at https://perma.cc/RFL2-5CT5 Defendants also used the Cloudflare service, which is also headquartered in San Francisco, California.  Both of these services are available in this District.

14.    At various stages in the project, the Defendants required a Know Your Customer ("KYC") process, where the investors had to confirm their identity and location.  For example, in an Ask Me Anything session ("AMA") on December 12, 2023, the team discussed the steps that were involved, and noted that they were using a third-party provider called Veriff.  The team specifically noted that investors who were located in the United States would probably have a faster processing time than some other jurisdictions.  Defendants did not take any steps to prevent Americans from signing up.  Through this and similar KYC processes the Defendants were very much aware that their investors included American citizens and residents.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants:

a)    Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell the unregistered securities at issue in this litigation through the use or medium of any prospectus or otherwise;

---

[1] A wallet for digital assets plays a role that is similar in some respects to a traditional bank account because it is a location where digital assets such as cryptocurrencies, NFTs, and tokens can be held.  Each wallet has a public address and a private key.  If Party A wants to receive a payment from Party B, Party A sends the public address of the wallet to Party B who initiates the transfer.  Party A can then access the wallet using the private key that only they know.

b)      Carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, the unregistered securities at issue in this litigation for the purpose of sale or for delivery after sale; and

c)      Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise the unregistered securities at issue in this litigation.

## **PARTIES**

**Plaintiffs**

16.      This action is brought on behalf of 233 plaintiffs who invested in NFTs from the Defendants, invested in TradeAI pools, or invested in StakX syndicates (the "Plaintiffs").

17.      Collectively, the Plaintiffs suffered damages well in excess of $20 million.

18.      The Plaintiffs' names and countries of residence are as follows:

1.      Plaintiff James Adams is a resident of the United States.

2.      Plaintiff Joyce Adjei is a resident of Germany.

3.      Plaintiff Jimmie Ahlström is a resident of Sweden.

4.      Plaintiff Hiren Aka Montu Govindbhai Patel is a resident of Australia.

5.      Plaintiff Yakup Alici is a resident of Türkiye.

6.      Plaintiff Krasthorn Alongkornrasmee is a resident of Thailand.

7.      Plaintiff Eric Andersen is a resident of the United States.

8.      Plaintiff Michele Irene Arauz Castillo is a resident of the United States.

9.      Plaintiff Kevin Austin is a resident of the United States.

10.      Plaintiff Marc Aymerich is a resident of Canada.

11.      Plaintiff Chetan Bafna is a resident of the United States.

12.      Plaintiff Frank Bakker is a resident of United Arab Emirates.

13.    Plaintiff Derek Barss is a resident of Canada.

14.    Plaintiff Claudio Bärtschi is a resident of Switzerland.

15.    Plaintiff Michael Bauer is a resident of Germany.

16.    Plaintiff Florian Beck is a resident of Portugal.

17.    Plaintiff Will Beinert is a resident of the United States.

18.    Plaintiff Christina Berta is a resident of United Arab Emirates.

19.    Plaintiff Christopher Botto is a resident of the United States.

20.    Plaintiff Taylor Donald Brinton is a resident of the United States.

21.    Plaintiff Stephen Bruchet is a resident of Canada.

22.    Plaintiff Claire Brynycz is a resident of the United Kingdom.

23.    Plaintiff Kyle Burklund is a resident of the United States.

24.    Plaintiff Richard Buteyn is a resident of the United States.

25.    Plaintiff Hila Cage Coppola is a resident of the United States.

26.    Plaintiff Jeroen Campfens is a resident of The Netherlands.

27.    Plaintiff Alpha Camps Dao is a resident of the United States.

28.    Plaintiff Marco Cantarutti is a resident of Italy.

29.    Plaintiff Keyshawn Carr is a resident of the United States.

30.    Plaintiff Cole Caudill is a resident of the United States.

31.    Plaintiff Pak Ho Ambrose Chan is a resident of Hong Kong.

32.    Plaintiff Virapong Chandarasanti is a resident of the United States.

33.    Plaintiff Wilson Chin is a resident of Australia.

34.    Plaintiff Bernie Chiv is a resident of Thailand.

35.    Plaintiff Alfie Chow is a resident of Singapore.

36.    Plaintiff Michael Clarke is a resident of the United States.

37.    Plaintiff Maxime Coin is a resident of The Netherlands.

38.    Plaintiff Mahius Concord is a resident of the United States.

39.    Plaintiff Chevrolet Cruz is a resident of Philippines.

40.    Plaintiff Gabi Dagher is a resident of the United States.

41.    Plaintiff Haithem Dakhli is a resident of France.

42.    Plaintiff Finley Dale is a resident of Australia.

43.    Plaintiff Andrew Dalecki is a resident of the United States.

44.    Plaintiff Brody Daniels is a resident of the United Kingdom.

45.    Plaintiff Juan Carlos De Llano is a resident of Mexico.

46.    Plaintiff Simon Dent is a resident of the United Kingdom.

47.    Plaintiff James Devlin is a resident of the United States.

48.    Plaintiff Jayden Di Palma is a resident of Australia.

49.    Plaintiff Akryd Institut Digital is a resident of Deutschland.

50.    Plaintiff Guillaume Dubost is a resident of Belgium.

51.    Plaintiff Dennis Duncan is a resident of Australia.

52.    Plaintiff Albert Duncan is a resident of the United Kingdom.

53.    Plaintiff Eduardo Elizondo is a resident of Mexico.

54.    Plaintiff Samrat Eltepu is a resident of the United States.

55.    Plaintiff Samrat Eltepu is a resident of the United States.

56.    Plaintiff Michael Enriquez is a resident of the United States.

57.    Plaintiff Kenneth Gamble is a resident of the United States.

58.    Plaintiff Timothy Gary is a resident of the United States.

59.    Plaintiff Massimo Gasparini is a resident of Australia.

60.    Plaintiff Stefan Gasselseder is a resident of Austria.

61.    Plaintiff Buta Cosmin Gheorghe is a resident of Romania.

62.    Plaintiff Shanjan Kumar Gnanasekar is a resident of Australia.

63.    Plaintiff Shanjan Kumar Gnanasekar is a resident of Australia.

64.    Plaintiff Tim Goddard is a resident of the United States.

65.    Plaintiff Glenn Gordon is a resident of the United States.

66.    Plaintiff Rory Graman is a resident of the United States.

67.    Plaintiff Tim Grice is a resident of Australia.

68.    Plaintiff Deann Haist is a resident of the United States.

69.    Plaintiff Todd Hallam is a resident of the United States.

70.    Plaintiff Jason Haskell is a resident of the United States.

71.    Plaintiff Jason Haskell is a resident of the United States.

72.    Plaintiff Ashley Hautman is a resident of the United States.

73.    Plaintiff Michael Hazilias is a resident of Australia.

74.    Plaintiff Benjamin Heimann is a resident of the United States.

75.    Plaintiff Levi Hendrickson  is a resident of United States .

76.    Plaintiff Greg Hernacki is a resident of the United States.

77.    Plaintiff Ryan Hodder is a resident of Australia.

78.    Plaintiff Ryan Hodder is a resident of Australia.

79.    Plaintiff Joel House is a resident of the United States.

80.    Plaintiff Seth House is a resident of the United States.

81.    Plaintiff Tasnuva Huda is a resident of the United States.

82.    Plaintiff Darshan Jalan is a resident of India.

83.    Plaintiff Foo Jee Ming is a resident of Singapore.

84.    Plaintiff Jay Johansen Lim is a resident of Australia.

85.    Plaintiff Jordache Johnson is a resident of the United States.

86.    Plaintiff Bradley Kamieniarz is a resident of Australia.

87.    Plaintiff James Karavas is a resident of the United States.

88.    Plaintiff Rachael Kay is a resident of Australia.

89.    Plaintiff Rachael Kay is a resident of Australia.

90.    Plaintiff Daman Khaihra is a resident of Canada.

91.    Plaintiff Poovanut Khamhaeng is a resident of the United States.

92.    Plaintiff Mohammad Khan is a resident of Thailand.

93.    Plaintiff Mohammad Khan is a resident of Thailand.

94.    Plaintiff Felix Kilga is a resident of Austria.

95.    Plaintiff Travis Kohler is a resident of the United States.

96.    Plaintiff Jonas Kolberg is a resident of Sweden.

97.    Plaintiff Dominick La Spisa is a resident of the United States.

98.    Plaintiff Michael La Spisa is a resident of the United States.

99.    Plaintiff Lewis Langer is a resident of the United States.

100.    Plaintiff Marwan Laugier is a resident of France.

101.    Plaintiff Fernando Leal is a resident of Argentina.

102.    Plaintiff Shaun Leggett is a resident of Australia.

103.    Plaintiff Daniel Lestarge is a resident of the United States.

104.    Plaintiff Johan Levaniants is a resident of The Netherlands.

105.    Plaintiff Xiaotian Lin Lin is a resident of Australia.

106.    Plaintiff Michael Lord Microbilo Smith is a resident of the United Kingdom.

107.    Plaintiff Jack Louis is a resident of Australia.

108.    Plaintiff Aaron Lowe is a resident of Australia.

109.    Plaintiff Farah Manley is a resident of Canada.

110.    Plaintiff Aaron Markham is a resident of the United States.

111.    Plaintiff Pedro Martins is a resident of the United Kingdom.

112.    Plaintiff Duane Mateski is a resident of the United States.

113.    Plaintiff Sean Matthys is a resident of the United States.

114.    Plaintiff Darren Mattock is a resident of Australia.

115.    Plaintiff Marcus Maxwell is a resident of the United States.

116.    Plaintiff Colton Mccoy is a resident of the United States.

117.    Plaintiff Blake Mcelmurry is a resident of the United States.

118.    Plaintiff Mike Mcguire is a resident of the United States.

119.    Plaintiff Johannes Meger is a resident of Germany.

120.    Plaintiff Georgi Merazchiev is a resident of Bulgaria.

121.    Plaintiff Nicholas Mercier is a resident of the United States.

122.    Plaintiff Stephan Michels is a resident of Italy.

123.    Plaintiff Adrian Militaru is a resident of Romania.

124.    Plaintiff Casey Miller is a resident of Philippines.

125.    Plaintiff Ivan Mladenovic is a resident of Serbia.

126.    Plaintiff David Mooney is a resident of Australia.

127. Plaintiff Christopher Morel is a resident of Seychelles.

128. Plaintiff Christopher Morel is a resident of Seychelles.

129. Plaintiff Ajeesh Mulavinal Mathew is a resident of the United States.

130. Plaintiff Evan Murphy is a resident of Portugal.

131. Plaintiff Taito Myllynen is a resident of Thailand.

132. Plaintiff Glen Naughton is a resident of Australia.

133. Plaintiff Carlos Navarro is a resident of Panama.

134. Plaintiff Collin Neitzel is a resident of the United States.

135. Plaintiff Charles Neitzel is a resident of the United States.

136. Plaintiff Alessandro Nery is a resident of the United States.

137. Plaintiff Nathan Nguyen is a resident of Australia.

138. Plaintiff Michał Nguyen Van is a resident of Poland.

139. Plaintiff Michał Nguyen Van is a resident of Poland.

140. Plaintiff Colton Nimz is a resident of the United States.

141. Plaintiff Wesley Clarence Sy O is a resident of Philippines.

142. Plaintiff Brian Daniel Ochs is a resident of the United States.

143. Plaintiff Colin Ogorman is a resident of Canada.

144. Plaintiff Chun Seng Ong is a resident of Singapore.

145. Plaintiff Raymond Ong is a resident of Singapore.

146. Plaintiff Christian Oppl is a resident of Germany.

147. Plaintiff Dipak Pandey is a resident of Australia.

148. Plaintiff Dimitrios Papaioannou is a resident of Canada.

149. Plaintiff Andrei Paraschiv is a resident of France.

150.   Plaintiff Mark Pearce is a resident of Thailand.

151.   Plaintiff Mark Pearce is a resident of Thailand.

152.   Plaintiff Egor Pelevkin is a resident of the United States.

153.   Plaintiff Egor Pelevkin is a resident of the United States.

154.   Plaintiff Wouter Peters is a resident of The Netherlands.

155.   Plaintiff Georgios Petrou is a resident of Cyprus.

156.   Plaintiff Andreas Pierrou is a resident of Sweden.

157.   Plaintiff Keith Pillsbury is a resident of the United States.

158.   Plaintiff Caroline Poisson is a resident of Canada.

159.   Plaintiff Harry-Antony Poulos is a resident of Australia.

160.   Plaintiff Harry-Antony Poulos is a resident of Australia.

161.   Plaintiff David Poynter is a resident of the United States.

162.   Plaintiff Christian Poynter is a resident of the United States.

163.   Plaintiff Stephen Poynter is a resident of the United States.

164.   Plaintiff Ivan Rajcic is a resident of Croatia.

165.   Plaintiff Jhojan Eliecer Ramirez Beltran is a resident of the United States.

166.   Plaintiff Amit Rathod is a resident of Australia.

167.   Plaintiff Amit Rathod is a resident of Australia.

168.   Plaintiff Gavin Rennie is a resident of Portugal.

169.   Plaintiff Joyal Rodrigues is a resident of Australia.

170.   Plaintiff Marc Rogers is a resident of the United Kingdom.

171.   Plaintiff Nelson Rosales is a resident of Canada.

172.   Plaintiff Mantas Ryzakovas is a resident of Lithuania.

173.    Plaintiff Sudhanshu  Sachan is a resident of India.

174.    Plaintiff Dheeraj Sanjeev is a resident of India.

175.    Plaintiff Sean Santos is a resident of Philippines.

176.    Plaintiff Anisha Keshav Sarin is a resident of Australia.

177.    Plaintiff Marc Sedillo is a resident of the United States.

178.    Plaintiff Paul Shuen Hwa Seo is a resident of New Zealand.

179.    Plaintiff Paul Shuen Hwa Seo is a resident of New Zealand.

180.    Plaintiff Khurram Shah is a resident of the United Kingdom.

181.    Plaintiff Balazs Sinka is a resident of Hungary.

182.    Plaintiff Raphael Soh is a resident of Singapore.

183.    Plaintiff Michael Sparks is a resident of the United States.

184.    Plaintiff Nathan Spencer is a resident of Australia.

185.    Plaintiff Nathan Spencer is a resident of Australia.

186.    Plaintiff Timo Sprotte is a resident of Germany.

187.    Plaintiff Timo Sprotte is a resident of Germany.

188.    Plaintiff Zachary Staudt is a resident of the United States.

189.    Plaintiff Andrew Steedman is a resident of the United States.

190.    Plaintiff Mark Steen is a resident of Australia.

191.    Plaintiff Jason Steen is a resident of Australia.

192.    Plaintiff Jason Steen is a resident of Australia.

193.    Plaintiff Christian Steffey is a resident of the United States.

194.    Plaintiff Clark Stewart is a resident of the United Kingdom.

195.    Plaintiff Yvo Stoots is a resident of The Netherlands.

196.    Plaintiff Ryan Stout is a resident of the United States.

197.    Plaintiff David Street is a resident of the United Kingdom.

198.    Plaintiff Jonathan Succar is a resident of France.

199.    Plaintiff Sujith Sugathan is a resident of Australia.

200.    Plaintiff Rateb Suleiman is a resident of the United States.

201.    Plaintiff Mitchell Sun is a resident of the United States.

202.    Plaintiff Madhav Sunil Nath is a resident of Australia.

203.    Plaintiff Abdullah Swailimyeen is a resident of the United States.

204.    Plaintiff Sam Tait is a resident of Australia.

205.    Plaintiff Nicholas Tan is a resident of Singapore.

206.    Plaintiff Nicholas Tan is a resident of Singapore.

207.    Plaintiff Tim Taylor is a resident of the United States.

208.    Plaintiff Alexander Simon Templeton is a resident of the United States.

209.    Plaintiff Samuel Thompson is a resident of Australia.

210.    Plaintiff Gregory Tiffany is a resident of the United States.

211.    Plaintiff Dikran Tokat is a resident of Canada.

212.    Plaintiff Wiljan Torrefiel is a resident of Philippines.

213.    Plaintiff William Torrens is a resident of the United Kingdom.

214.    Plaintiff Daniel Trabold is a resident of Sweden.

215.    Plaintiff Alvin Him Kheng Tung is a resident of Malaysia.

216.    Plaintiff Michael Tyler is a resident of Canada.

217.    Plaintiff Elaine Upton is a resident of the United Kingdom.

218.    Plaintiff Tamar Van Der Haas is a resident of Thailand.

219.    Plaintiff Tamar Van Der Haas is a resident of Thailand.

220.    Plaintiff Sander Van Der Vegte is a resident of Portugal.

221.    Plaintiff Marta Vegas Coletas is a resident of Canada.

222.    Plaintiff Alexis Viprey is a resident of France.

223.    Plaintiff Edward Vonallmen is a resident of the United States.

224.    Plaintiff Jordan Wadsworth is a resident of Australia.

225.    Plaintiff Vaibhav Wankhedkar is a resident of India.

226.    Plaintiff Cory Watkins-Suzuki is a resident of the United States.

227.    Plaintiff Katie Whitaker is a resident of the United Kingdom.

228.    Plaintiff Maciej Wilk is a resident of Switzerland.

229.    Plaintiff Maciej Wilk is a resident of Switzerland.

230.    Plaintiff Benjamin Wojcik is a resident of the United States.

231.    Plaintiff Craig Zadrapa is a resident of the United States.

232.    Plaintiff Muhammad Waqas Zaman is a resident of Canada.

233.    Plaintiff Adil Ziad is a resident of the United States.

19.    Those Plaintiffs who purchased NFTs from OCB collections are referred to as "OCB Plaintiffs."

20.    Those Plaintiffs who purchased NFTs from TradeAI (or VispX) collections are referred to as "TradeAI Plaintiffs."

21.    Those Plaintiffs who purchase NFTs from UA3 collections (including PunkApe NFTs) are referred to as "UA3 Plaintiffs."

22.    Those Plaintiffs who purchased NFTs from Supreme Kong collections are referred to as "Supreme Kong Plaintiffs."

23.    Some Plaintiffs purchased multiple NFTs from different relevant collections, and therefore are in multiple groups.

**Defendants**

24.    Defendant Guillermo Gharib ("Gharib") was described as a prominent or genius cryptocurrency trader who was the mastermind behind the trading strategies at TradeAI and StakX. He publicly served as the CEO and founder of BeNFT (which was later renamed as BeAI).  A brief description of his background was posted to LinkedIn.com.  *See* https://www.linkedin.com/posts/beaisolutions_team-ceo-benft-activity-7062231319778332672-wrRc/, archived at https://perma.cc/3BVE-YJTB He sometimes used the screen names "DeGen StakX," "gm_japan_beai," and other similar terms. He also often was known by nicknames such as "Guilly" or "G."  Gharib has represented that he is a Costa Rican and Swiss citizen, and his last known residency was in Costa Rica.

25.    Defendant Ashley Harris ("Harris") was the founder of the company VispX, which operated as a incubator or investor for web3 projects.  He often used the screen name "Kingsmith." He is an Australian citizen whose last known residency was in Thailand.

26.    Defendant Cyrus Abrahim ("Abrahim") is the founder and leader of the web3 community Jungle Labs.  Abrahim uses the screen name "Cyrus."  Abrahim is a resident of Virginia.

27.    Defendant James Abboss Binaiz ("Biniaz"), who is also sometimes known as Jim Aylward, is one of the founders of the group known as UA3.  Biniaz uses the screen name "jim_nft" or "nftjim."  Public reports have claimed that Biniaz uses the name Aylward, and that he has previous convictions in the United Kingdom "for a scam against the tax department" as well as assault and robbery.  https://www.watoday.com.au/national/western-australia/crypto-currency-entrepreneur-behind-company-trying-to-buy-perth-glory-is-convicted-fraudster-

20200224-p543qd.html, archived at https://perma.cc/5XCD-6XEL.   Biniaz is a citizen of the United Kingdom and resides in Dubai.

28.    Defendant Peter McInnes ("McInnes") is also one of the founders of UA3.  He is often known as "Paddy," and uses the screen name "Paddyisbored" or similar variations.  McInnes is a citizen of the United Kingdom and resides in Dubai.

29.    Defendant Nicholas Schmidt ("Schmidt") is a co-founder of the web3 community On Chain Buccaneers ("OCB").  He uses the screen name "Jampzer." Schmidt promotes web3 projects and investment opportunities to his community.  Schmidt is a resident of Canada.

30.    Defendant Oliver Wood ("Wood") is a co-founder of the web3 community OCB. He uses the screen name "Hydraze," "Hydraze420," and other similar names. Wood promotes web3 projects and investment opportunities to his community.  Wood is a resident of Dubai and the United Kingdom.

31.    Defendants Gharib, Harris, Abrahim, Biniaz, McInnnes, Schmidt, and Wood are collectively referred to as "Defendants."

## FACTUAL ALLEGATIONS

### The Origins of the TradeAI Project

32.    The origins of TradeAI can be traced to BeNFT, a blockchain-powered e-learning platform that combined artificial intelligence ("AI") and decentralized finance ("DeFi") to create a "learn and earn" educational ecosystem. Initially marketed as a revolutionary approach to online education, BeNFT claimed that it would utilize AI, metaverse integrations, and blockchain technology to promise personalized learning experiences alongside financial rewards for participation.

33.    BeNFT introduced its flagship product, the LearnAI platform, which leveraged AI tutors, evolutionary NFTs, and community-driven collaboration to provide students with

interactive and personalized educational opportunities. The platform also incorporated DeFi functionality, such as financial incentives for learning, certificates on the blockchain, and marketplaces for NFT collections. The platform emphasized accessibility, transparency, and financial inclusion, claiming to break down traditional barriers to education.

34.     BeNFT posted an explanatory video on many websites, including LinkedIn.com, which     is     based     in     the     United     States.     *See,     e.g.*, https://www.linkedin.com/posts/beaisolutions_benft-ai-powered-learn-solutions-activity-7064329646883885056-PaB8/, archived at https://perma.cc/JL7R-R59E. One of the main websites for BeNFT was www.benft.solutions, which was an interactive website that was available in the United States. The domain was registered through GoDaddy.com, LLC, which is based in the United States, and the registrant contact is Domains by Proxy, LLC, which is based in Tempe, Arizona. *See* https://www.whois.com/whois/benft.solutions, archived at https://perma.cc/7NC9-LJBR. BeNFT also included promotional videos on YouTube.com, but these have been removed from the website.

35.     BeNFT announced their supposed achievements in creating an online learning company that was powered by AI. *See* https://coinmarketcap.com/academy/article/86df2387-a210-4024-bc02-fde460b7abed, archived at https://perma.cc/2UMZ-ARRM. This same announcement in or around April 2023 noted the early involvement of several of the Defendants. It stated that BeNFT was "collaborating with several leading online communities in the crypto space, such as VispX. VispX was cofounded by Defendant Harris.

36.     Neither BeNFT nor BeAI venture achieved significant success in their original business models. By the second quarter of 2023, the platform began shifting its focus away from educational products toward financial investments marketed under the guise of high-yield returns.

This pivot marked the beginning of BeNFT's transformation into TradeAI, signaling a departure from its original educational mission to a purported investment platform promising extraordinary profits.

37.     TradeAI operated as an NFT-gated investment platform: users had to purchase specific NFTs in order to invest in the high-yield investment pools. This structure added a layer of exclusivity to the platform, creating the appearance of legitimacy and innovation in the investment process.  The NFT that the investor held would determine the amount that they could invest in the pools; this was referred to as the allocation.  If an investor wanted to invest additional amounts in the investment pools beyond their allocation, they would have to purchase additional NFTs.

38.     For example, Defendant Harris (using his screen name Kingsmith) explained, on June 26, 2023, on the VispX Discord server that he administered that holders of the AnarKey NFT would have to pay $5,000 for each NFT but then could invest up to $5,000 into an investment pool:



39.     Purchasing an NFT provided access to the TradeAI platform's front-end interface. From there, investors such as the Plaintiffs were directed to select an investment pool and commit

funds using the USDT digital asset, which is a "stablecoin" pegged 1:1 to the US dollar.  The TradeAI website[2] was an interactive website that was accessible in the United States.  While the individuals involved with the TradeAI program have removed many of the documents that referred to the Company from the Internet, one promoter of the project ("ToastPunk") created a YouTube video that walked through the process of accessing the website, connecting a wallet with cryptocurrency, selecting an investment pool, transferring funds into the pool, and viewing the expected returns on the investments:



https://www.youtube.com/watch?v=S0IJF7coZv8

40.     In order to expand their reach and receive more invested funds, TradeAI conspired with prominent and influential individuals in the cryptocurrency community.  These Key Opinion

---

[2] The website used to be available at www.tradeai.solutions, but it is no longer live.

Leaders are social media influencers who maintain large followings on platforms like Twitter and Discord and often run exclusive communities known as "alpha groups." The KOLs control access to their alpha groups by selling their own NFT collections, which are used as membership passes. Members of the alpha groups are essentially paying for access to the advice and opportunities offered by the KOLs, who introduce new digital asset collections, partnerships, or investing opportunities based on their own connections to other prominent figures. This relationship between each KOL and their community members helps establish trust in the opportunities that the KOL recommends.

41.    Defendants Schmidt and Wood, were the leaders of On-Chain Buccaneers (OCB), a prominent alpha group. Jointly, these individuals formed the nucleus for recruitment across multiple alpha groups that recruited hundreds of investors. These recruits, in turn, brought in additional KOLs, enabling the scheme to grow exponentially in a structure resembling a multi-level marketing (MLM) model. The collaboration between TradeAI and its network of KOLs was central to the scheme's success, as these influencers utilized their platforms to promote TradeAI's investment pools and recruit their own communities into the scheme.

42.    Ashley Harris was one of the early KOLs involved with promoting the project. Harris is the CEO and founder of VISPX, which is a company that purports to be a "launch pad" or incubator for web3 projects.

43.    TradeAI was one of the companies that VISPX funded and helped to launch. VISPX officially announced its incubation program and a $300,000 investment in BeNFT on March 21, 2023. Like most of the communications from Harris and VispX, the announcement was made on a Discord server for the VispX community and on Twitter. The announcement reported BeNFT's performance metrics, including $820,000 in profits distributed across 314

wallets and high weekly yields in USDT.  BeNFT was described as a "cutting-edge AI-Powered

SaaS platform offering a wide range of earning solutions":



44.      BeNFT made it clear that this investment was used to develop the platform:

> Firstly, VispX incubated BeNFT Solutions and helped the platform to raise $302,000 through private token sales. ***This funding was critical to the platform's growth and development***, enabling it to continue building and expanding its innovative online education platform.

https://coinmarketcap.com/community/articles/645479b70d1ac45ba8740bd1/, archived at

https://perma.cc/QT92-JHSE (emphasis added).

45.      The Defendants sold and promoted several NFTs that provided access to the

BeNFT, BeAI, and TradeAI platforms.  The first NFT that VispX issued was the Xborg NFT,

which   was   issued   in   March   2023   through   the   website   OpenSea.com.    *See*

https://opensea.io/collection/xborg-nft.  Other TradeAI NFTs that provided access to the TradeAI platform included the Genesis Pass NFT (sometimes referred to as the "Gen 1" NFT), Anarkey NFT, and Memewhales NFT.  These NFTs were also primarily available for sale on OpenSea.com, which is headquartered and operates in the United States, and is accessible to United States citizens.  *See, e.g.*, https://opensea.io/collection/anarkey ("ANARKEY is an innovative Genesis collection of 1,111 Hybrid NFTs that grant holders access to the TradeAI SaaS Platform, unleashing a wide range of utilities and benefits."); https://opensea.io/collection/memewhales.

46.    On March 27, 2023, Defendant Harris announced on Discord the commencement of a BeNFT pool with a $100,000 USDT allocation in total for all Xborg NFT holders, offering a 10% kickback to all Xborg investors for their participation in the initial investment.



47.     Defendant Harris also made it clear that he was in communication with Defendant Gharib: "The CEO of BeNFT couldn't be happier with the VispX community and the treatment he has received so far as an official incubated project of VispX."

48.     On May 9, 2023, VispX announced that the BeNFT total pool size had increased to $1,000,000 USDT, specifically for XBorg holders.   The investment parameters included a

minimum investment of $2,500 USDT and a maximum investment cap of $30,000 USDT in the pool.

49.    BeNFT also issued its own gate-keeping NFTs.  On April 20, 2023, BeNFT announced that it had issued its Genesis Pass NFTs (also known as Gen 1) and raised $1.7 million. The Genesis Pass NFT was the first official TradeAI NFT. TradeAI would later offer two other NFT collections as keys to access their trading pools, the Anarkey and Memewhales NFTs.

**The Growth of TradeAI and the Development of Pools Led By KOL Promotors**

50.    The investments in TradeAI and the platform continued to grow over the Summer of 2023.

51.    In order to incentivize the participation of KOLs, TradeAI developed different investment pools for Plaintiffs and other investors to purchase. TradeAI promised varying returns depending on the pool and investment period. Returns ranged from 10% over 10 days to 50% in a single week. These yields were modified throughout the platform's operation, often increasing to attract additional investments.

52.    Each pool had a set lock-in period during which the invested funds were held. At the end of the term, the capital was supposed to be returned to investors along with the promised yields.

53.    To maintain engagement and drive interest, TradeAI branded many of these pools with specific names and unique offerings, further fueling the illusion of a sophisticated and dynamic investment ecosystem.

54.    There were two broad categories of pools offered by TradeAI:  TradeAI-specific pools and alpha group-specific pools. TradeAI-specific pools, such as the "Black and White Pool" and the "DGEN Corner," were branded under the TradeAI platform and marketed as general access pools for eligible investors. Alpha group pools, notably, partner pools, were tailored to individual

KOLs and their communities, allowing KOLs to further integrate their members into the scheme while enhancing the exclusivity of their offerings.

55.     To further incentivize KOL participation and community recruitment, TradeAI created a two-tiered pool system among the alpha-group pools.  The "partner pools" were reserved for the largest and most influential alpha groups, including On-Chain Buccaneers. These pools represented the pinnacle of TradeAI's multi-level marketing scheme and provided substantial financial benefits to the KOL leaders of the alpha groups.

56.     The investors in these pools would be charged "taxes," which would often be 10% of the amount invested.  This would be sent directly to the KOLs associated with the pools.  For example, in the walkthrough posted by ToastPunk to YouTube discussed in paragraph 39, it is clear that ToastPunk intended to invest $500 USDT into a pool, but he was charged an additional $50 USDT to cover the tax:



https://www.youtube.com/watch?v=S0IJF7coZv8

57.     In contrast, B2B pools were targeted at smaller alpha groups that often had fewer than 100 members. These pools did not offer direct financial benefits, such as taxes. This structure

created a division between the benefits offered to larger, influential alpha groups and smaller communities, with larger groups receiving significant financial incentives while smaller groups were left to rely solely on perceived access to exclusive opportunities.

58.    Through this hierarchical structure, TradeAI rapidly scaled its operations, leveraging the trust and reach of KOLs to recruit investors and generate substantial investment capital. By tying access to investment pools to NFT ownership and creating a multi-level marketing framework that rewarded large-scale participation, TradeAI successfully expanded its Ponzi scheme.

**On Chain Buccaneers, the Ship, Jampzer and Hydraze**

59.    On July 14, 2023, Defendant Schmidt announced on the On Chain Buccaneers Discord that TradeAI would soon open the B2B trading pools, and that the OCB community would have the opportunity to invest.  He was clear that the money would be used for trading:  "Go do some research and understand what their trading strategies are, how they are trading, and make up your own mind;" "THIS IS NOT FINANCIAL ADVICE. THIS IS JUST A PRESENTATION OF AN OPPORTUNITY TO PARTICIPATE IN A DEFI TRADING PROTOCOL THAT HAS BEEN DOING WORK."  (Capitalization in the original.)

60.    This OCB-specific pool (which was known as "The Ship") was promoted as providing a 15% return every ten days based on the trading performed by TradeAI.  Schmidt also promised that the pool would be principal protected, and that the invested principal would be locked up (or "staked") for 30 days.[3]  As an illustration, Schmidt explained on his Discord server that investing $1,000 would result in $1,450 after 30 days.

---

[3] There were several different versions of related investment pools using The Ship branding, such as The Ship Black and White (which provided double or nothing odds) and The Quick Ship (which had a shorter time frame).



61.    Defendant Schmidt tried to hedge his promotion of the investment pool with disclaimers that this was "a highly risky play," but in the same sentence he noted that he had successfully withdrawn his profits five times and that "there is always an element of Ponzi."

62.    Even though he admonished his community that they should "go do some research and understand what their trading strategies are," there was no material information provided about what TradeAI's supposed trading strategies were.  For example, one of Schmidt's coworkers in his consulting firm, FlareLabs.io, posted with the user name "0x©.og"[4] on Discord about TradeAI the same day and the next day about this announcement.  Even though he was in communication with Schmidt, it was clear that, on July 15, he had several fundamental questions about how the TradeAI platform worked: "Some abc on how the system works would be nice and if the contract has been audited as well with reference would be awesome;" "not any legal information on the

---

[4]        https://flarelabs.io/team, archived at https://perma.cc/9SRT-LKDS.

website"; "who's the owner? twitter, discord? anyone know who are the team?" (capitalization in original)  There was no meaningful way for investors to "do their own research" and had to trust the recommendations of prominent figures such as Defendant Schmidt.

63.     Defendant Schmidt continued to promote his profits in the TradeAI pools.  For example, on July 26, 2023, he bragged to the OCB Discord about his gain of 35.9 Ethereum[5] in the TradeAI investment pool:



64.     Defendant Schmidt also promoted on Discord the gains that he had from selling (or "flipping") the Anarkey NFTs that allowed access to the TradeAI pools, further promoting these NFTs as valuable assets that appreciated on the secondary market as interest in TradeAI grew.



65.     Schmidt continued to market the Anarkey NFTs through October 2023.



---

[5] The Ethereum cyptocurrency closed at a price of $1,872 USD on July 26, 2023.  This amount was worth roughly $67,000 USD.

66.    The OCB investment pools were not like the regular B2B investment pools because they were partner pools.

67.    Defendant Schmidt also confirmed this on Discord¸ on September 9, 2023, stating that they "have put a lot of [their] resources, reputation, and weight behind TradeAI."

We are partner projects that have put a lot of our resources, reputation, and weight behind TradeAI and the products and services because we fully believe in them and are willing to go the extra mile. So do our people. I don't see a single message in the last few days that constitutes me having to chat to someone and say tone down.
We are here to support TradeAI and the offerings/ecosystem. And having partner communities in chat spreading love and good energy is actually the best thing for all of our bags.
✅ 3    ❤️ 1    😊

68.    The OCB team had insider access to TradeAI's operations. Flare Labs employees actively supported Defendant Harris in managing TradeAI's communications. [6] Moreover, TradeAI hired Schmidt and the Flare Labs technical team to develop wallet technology for managing the KYC processes and other technological expansions when repayment issues began to emerge.



@Render Yo @Kingsmith can you please give us a little hint when we will get those B2B roles? 😊 gracie ❤️
Kingsmith 09/11/2023 5:03 AM
I have a call today with @Jampzer - All love, no glove
We are looking to implement a wallet manager thingy, it look brilliant and could be a great fit for B2B
👍 13    🙏 10    🔥 5    🫡 2    😊

69.    Facing increasing concerns about the backlog and other difficulties returning investor money, Schmidt posted a lengthy statement on Discord warning about increasing "FUD"—fear, uncertainty, and doubt—in the community regarding TradeAI.  To restore confidence in the project he stressed that TradeAI was "scaling up their regulatory compliance and compliance teams."  Specifically, he claimed that a "Former SEC Lawyer has just been hired to

---

[6] Flare Labs is a consulting company that is composed entirely of OCB community members.  Founded by Defendants Schmidt and Wood, Flare Labs claims to leverage the founders' industry clout and network relationships, alongside a technical team consisting of a blockchain expert and a data specialist. The company specializes in collaborating with NFT collections and alpha groups, providing services such as brand development, promotional strategies, and market distribution. These operations mirror OCB's work with TradeAI.

run TAI legal" and a former Binance employee was hired to run the compliance department. He also stated that "Funds are safe, principal is protected in deposits by TradeAI."

70.     In this period, members of the community who questioned the TradeAI project were removed from the Discord for supposedly spreading FUD. This was a common tool by which KOLs policed the questioning of these investments and maintained control over the conversation.

71.     Defendant Schmidt did warn that there were risks involved in the investment pools (just like any other web3 project), that investors should be aware of the risks, and that investors should only put in money that they were willing to lose entirely. However, he still praised the performance of the pools, that everyone had profited, and peoples' lives had changed.



72.     On October 10th, 2023, Schmidt continued promoting TradeAI enthusiastically on Discord, saying, "Guys, I'm a bit concerned because Gilly said in the chat that what's next for subscribers will make us wet as fuck. Since then, I haven't been able to fall asleep. My pants keep getting moist." This statement not only reinforces his active endorsement of the project but also demonstrates his continued influence within the TradeAI community, hyping upcoming developments to maintain investor engagement and confidence amidst ongoing project issues.

73.    Notably, in late September and early October 2023, shortly before public acknowledgment of repayment problems, Defendant Schmidt sold 100 ETH worth of NFTs at peak value just before the market crashed. This raises questions about the extent of Schmidt and other OCB members' knowledge of the impending collapse.

**Members of OCB Had a Long Relationship with the UA3 Team**

74.    In April 2023, Defendant Wood moved to Dubai and within three days met Defendant McInnes. According to Wood, Defendant McInnes took him to view Banksy art in a warehouse full of super cars.

75.    On May 2, 2023, Defendant Wood announced on Twitter that the UA3 team is "the real deal," that a PUNKAPE membership can be your ticket to fractionalize Banksy Art and more, and that they would give away an OCB NFT. To qualify for this giveaway, viewers had to engage with their social media account (i.e., like, retweet, and tag three people, and follow several profiles).

76.    By May 17, 2023, Defendant Wood began collaborating with the PunkApe project and UA3. This collaboration marked a significant step in integrating Wood into the operations of both PunkApe and UA3, indicating a deepening involvement in their projects and initiatives.

77.    On June 14th, 2023, Defendant Wood attended a yacht party organized by the Dubai Ape Yacht Club, which included participation from both Punk Apes and Defendant McInnes. This event further solidified the connections between OCB and UA3, showcasing their collaborative relationship during this period.

78.    On August 8th, 2023, OCB members Schmidt and Wood gave their direct support to the UA3 mint by promoting them on Twitter. Additional OCB members actively engaged in promoting their purchases, further endorsing the mint within their community.

**TradeAI Continued to Grow on a Rocky Path Until Its Collapse in October 2023**

79.    After his work getting the investment portals in TradeAI off the ground, Defendant Harris continued to play a core role in the promotion of TradeAI and the solicitation of additional investments.  He made many statements about the security and functionality of the system to reassure investors, but he never disclosed the truth that this was a Ponzi scheme designed to steal investors' money.

80.    On July 5, 2023, Defendant Harris announced on the TradeAI Discord that the TradeAI strategies would "go live" soon with several investment strategies.  The same day, he clarified that the team was soliciting investments from US citizens because the "GREAT NEWS" would be available on several centralized exchanges ("CEX") in the United States, and even used an American flag emoji next to the Kraken CEX:



81.    The next day, Defendant Harris announced on Discord the upcoming Ask Me Anything (known as an AMA), that would cover, among other things, the "rev[enue] share model" for the investment strategies, indicating that investors would be sharing revenues that resulted from their investments.

82.    In an AMA held on July 9, 2023, with Defendants Harris, Gharib, and others from TradeAI, the team made it even more clear that they were marketing the project for US citizens. Around 43 minutes into the conversation, Defendant Harris asked Defendant Gharib about the

topic that constituted 85% to 90% of all of the questions submitted by the community: what about U.S. citizens, and what could they expect as a workaround? Defendant Gharib made it clear that "there's always workarounds," and that investors could use exchanges such as Mexic, Bitmart, or Kraken, or use different currency pairs within different exchanges.

83.    On the same AMA the team made an explicit comparison of holding the Anarkey NFT to shareholders in a company. In a discussion around 21 minutes into the AMA, Defendant Gharib stressed that the Anarkey NFT holders would receive a share of all of the profits on the trading activity in TradeAI. Another team member went on to explain that 49% of the profits (after operational expenses) would be distributed to Anarkey NFT holders because they were "giving their money to be operated by the system." It would be "completely passive income" just from holding the NFT. Defendant Gharib further explained about the profit sharing, and stressed that Anarkey NFT holders were "not users, right? You guys fucking own it along with us, or with TradeAI." He told Anarkey NFT holders to "just picture yourself as a . . . normal stakeholder. […] And then for that period, . . . did you get some dividends?"

84.    Investors in TradeAI were also required to reinvest 10% to 20% of their supposed profits back into the ecosystem by purchasing the native crypto token, which was called $BeAI. The $BeAI token was not widely recognized or traded outside the TradeAI ecosystem. For example, if a Plaintiff invested $1,000 and earned a 20% yield ($200), they were obligated to use $20 to $40 of that yield to purchase $BeAI tokens. This requirement was enforced under strict conditions.

85.    Plaintiffs were further compelled to hold the $BeAI tokens in their wallets for a mandatory minimum of 30 days, which was later extended to a maximum holding period of 90 days. Plaintiffs were explicitly informed that failure to adhere to these requirements would result

in significant consequences, such as being blacklisted or denied future yield payments. This financial pressure and intimidation coerced plaintiffs into compliance, creating artificial demand for $BeAI tokens.

86.    Because $BeAI had a low market capitalization, any purchasing activity would cause a dramatic price increase. During the relevant period, the token's price skyrocketed from its launch value of less than $1 to nearly $18 by early August (just 14 days after the launch of the OCB trading pool). However, this price increase was followed by a precipitous decline, with the token's value plummeting to approximately $0.50. The token never recovered, leaving plaintiffs with significant losses.

87.    The enforced holding requirement of 30 to 90 days meant Plaintiffs could not sell their tokens during the period of rapid price inflation, ensuring they could not benefit from the artificially high prices. The rapid decrease in value suggests that the price collapse was caused not by Plaintiffs selling off their holdings, but by insiders with significant allocations liquidating their tokens. This suggests that key insiders strategically profited at the expense of the Plaintiffs.

88.    Defendant Harris also made repeated statements about the security of the trading system to reassure the investors.  On July 31, 2023, Harris stated on Discord that they expected to "go live" in two weeks, but that they would use the time "to ensure that the SaaS [Software as a Service] is secure which we are currently securing a 3rd party auditing firm to ensure every user is 100% secure."  On August 10, 2023, he announced the implementation of the "seven-day pools of glory" strategy, allowing investors to claim yields directly from the pool, described as a return to "old school pools." He emphasizes that these changes ensure investors can "gain their yields safely."  Other team members made similar statements, such as Luis Tesorero, the CTO of TradeAI, who said on August 23, 2023 on Discord, that they would "continue working for you,

***protect you*** and improve your experience!"  Whenever operational issues or investor concerns arose, the TradeAI team frequently referenced "safety," "legal concerns," or "KYC compliance," in an effort to allay fears, despite questionable operations continuing.

89.    Defendant Harris continued to provide updates on Discord over the course of August, illustrating his central and authoritative role in the organization.  For example, he provided updates on the release schedule, the migration away from the pools into a "DeFi" platform, and updates on the conversations with vendors.  He repeatedly reassured users to stay calm, emphasizing that everything is progressing as planned.

90.    Throughout these updates, it was clear that the TradeAI project promised to provide an investment contract.  As Defendant Harris said on August 30, 2023, "Users will have the option to invest into different vehicles that are specifically tailored to different investor profiles based on risks, returns, and other variables."  The same update noted that the new Dashboard features would allow investors to review, inter alia, "Realized P&L," "Realized ROI," and "Unrealized P&L."

91.    Defendant Harris summarized the AMA held on August 27, 2023 for the Discord community.  Some of the points discussed reiterated the themes that the investments were safe, profitable, and similar to traditional investments, including:

- "Over $100 million in profits so far";
- "They are meeting with Goldman Sachs next month";
- "Audited on chain";
- "**Users funds are safe**" (emphasis in original);
- "Moving to hedge fund style appealing to institutional investors";
- "O.G.'s will get a passive percent of taxation distribution" where "O.G.s" are users who have been active before the new changes;
- "**Anarkey holders don't pay taxes**" (emphasis in original); and
- Defendant Harris would be the point of contact for B2B pools

92.    Defendant Harris and other TradeAI team members promised that they were revising the system to add a Software as a Service ("SAAS") model where investors could "rent"

the trading strategies from TradeAI.  However, despite promising to launch the new features in August, by September 1, 2023 Defendant Harris had to announce the continued delays of the promised Demo Day for the SaaS platform.  He directed users to review the platform's white paper for clarity, consistent with a pattern of deflecting operational concerns by referencing incomplete or unclear documentation to maintain investor confidence.

93.     However, by September 11, 2023, it was clear that there were serious problems when investors could not access their funds or receive their invested principal.  In a post on Discord subtitled "No need to panic," Defendant Harris told the community the "We want to reassure you that **YOUR** funds are safe.  Guilly [Defendant Gharib] is flying from Costa Rica to Singapore, once he lands, he will be focused on sorting claims," and that they were "continuing to push hard to ensure users are gaining access to their funds."   (Emphasis in original.) Defendant Harris continued to provide updates about the repayments and the order in which the claims would be repaid over the next few days.  Defendants Harris and Gharib continued to reassure the investors that the funds would be paid out soon.

94.     On September 23, 2024, Defendants Harris and Gharib participated in another AMA.  One of the topics that they discussed was why the TradeAI platform focused on gathering money from retail investors instead of either trading their own accounts and keeping all of the profits, or turning to institutional clients who could provide more capital on a longer horizon.  In an effort to convince the retail investors to keep their money in TradeAI, Gharib told the story that the entire project was some form of altruism, even while he was operating a Ponzi scheme:

> We know that the path to grow it if we want to grow it is not retail. That's a fact. And if we would like to grow it with the institutional, it's a different set up and we could do so like we would be offering one tenth of what we're offering right now on a [] larger time frame.  But the whole mission and vision and the testimonials speak for it. And the people that have been with us for a long time, they can vouch for this. This has helped a lot of users, a lot of people, people

that we don't even know. and that that has been always the goal of this is try to share what we know in a way that everybody can be benefited so that you can get some, some, you know, some leverage and just have a happier time.

95.    Defendant Harris echoed this sentiment: "Right? Today, the impact that, you know, trade AI has had on everyone's life made it. So it's an incredible, yeah, piece of tech money printing."

96.    In order to further reassure the listeners that the service was legitimate and following proper procedures, Defendant Gharib stressed that they had "onboarded a new compliance officer, former Binance, with links to [] high level institutions and organizations," and they would be administering their compliance with anti-money laundering laws.

97.    Unfortunately, the problems with the TradeAI website continued to escalate. Over the remainder of September, some users had double payments, while other deposits and transactions were not reflected on the system at all.  The series of events and communications demonstrate a pattern of misrepresentation, deflective communication, and mismanagement by the TradeAI team, contributing to a narrative of systematic misrepresentation leading up to what many investors would later experience as an initial "rug pull" event with TradeAI.

98.    By early October, the situation became even worse.  The TradeAI team claimed that the funds for investors were locked in a frozen account at Binance.  On October 5, 2023, Defendant Harris told the Discord group that "the last 2 months have been stressful on everyone. We went from a perfectly oiled machine helping out a lot of people, into a test of strength and trust."  He claimed that he received "official communication (from the 2 top level execs) that all TradeAI funds are to be released."  He announced a plan for repaying funds, and that they "are looking at mid-oct kickoff for the release of funds."

99.    A few days later, Defendant Harris announced on Discord that investors would be able to receive their payments in the TradeAI token, $TAI.  This token had no value or utility

outside of the TradeAI economy.  This strategy appears designed to extend TradeAI's lifespan by substituting cash payouts with tokens, effectively delaying real cash obligations under the guise of offering a new "investment opportunity."

100.    On October 24, 2023, TradeAI ceased all repayments to clients.  Concerns about delayed payments escalated into outright panic as accusations began to surface that the platform's claimed proof of reserves had been falsified and that the entire operation was a Ponzi scheme. The situation worsened as sentiment spiraled into a state of emergency within the community, with many investors demanding answers about the security and recovery of their funds.

101.    In response to the growing crisis, on October 31, 2023, TradeAI announced a plan for a new entity, UA3, to step in and manage the platform's recovery. UA3 was described as a firm with expertise in security and the ability to solve complex business problems. The announcement emphasized that "***there are sufficient assets to make the repayments required***."  (Emphasis in original.) It also stressed that Defendant Gharib would continue in his position, and "will remain in full control of the IP and will be driving the direction of the new entity."

102.    UA3 issued multiple public statements claiming that the underlying issues were due to corporate mismanagement and external security breaches, not a lack of reserves or fraudulent activity. The UA3 team further asserted that they were implementing new protocols, reinforcing security measures, and bringing in additional funds to stabilize the operation and ensure future payouts. These assurances, however, were later revealed to be part of a coordinated effort to obscure the true nature of the scheme.

103.    The Defendants continued to promote the story that Defendant Gharib was a master crypto trader, and that the project would continue after the problems with the release of funds from

Binance were solved.  On or about October 30, 2023, Defendant Harris posted a note on Discord claiming that Defendant Gharib was continuing to trade and amaze the new team from UA3:



104.    The series of events and communications from September 26, 2023, to October 31, 2023, demonstrate a pattern of misrepresentation, deflective communication, and mismanagement by the Defendants.

105.    The UA3 team was referred to TradeAI by Defendant Schmidt.  UA3 had no experience in crisis management, nor did any member of their team have Blockchain specific experience that would have made them suitable for handling this situation. On multiple occasions, Community members questioned the wisdom of hiring UA3, citing the lack of experience. Additionally, UA3 issued a statement claiming they had the financial resources to manage any cash flow issues, and that they had the network to manage the crisis, leading way to the rise of StakX.

106.    When asked whether he had trust in UA3 to fix the problems at TradeAI, Defendant Schmidt told his community on Discord that he had faith in them and that almost no one else could do the work that they were doing:



**The TradeAI Team Converts to the StakX Syndicates to Ensure the Scheme Continues**

107.    By late November 2023, TradeAI transitioned to a new platform called StakX, marking a clear effort to rebrand and distance itself from the mounting allegations of mismanagement.  Instead of offering "investment pools" with a front-end website, the StakX project consisted of a series of "syndicates" where investors would send their money to a wallet address promoted by one of the Defendants.  The funds sent to these wallets would be combined and supposedly invested by Defendant Gharib.

108.    Similar to the TradeAI pools, the StakX syndicates required investors to hold NFTs for access and allocation into investment opportunities. However, the StakX structure presented a much clearer multi-level marketing (MLM) or umbrella hierarchy compared to TradeAI.  A striking feature of the syndicates was that roughly 50% of all supposed trading profits were sent back to the StakX team, which was actually the same team as the TradeAI team, even though the TradeAI project collapsed spectacularly just a few weeks before.

109.    Within the StakX system, two primary umbrella structures emerged. The first was the UA3 umbrella, which was directly partnered with OCB. The second was the Jungle Labs umbrella, overseen by Cyrus, under which several smaller projects operated. Each umbrella and its associated syndicates played a distinct role in expanding the overall reach of the StakX operation.

110.    UA3 launched a new NFT collection called Punk Apes. These NFTs served as "boosters," purportedly increasing the "yields" of investments placed into the syndicate pools. In addition, Punk Apes were tied to the issuance of a new token called $BORD. If staked, the $BORD token promised further yield enhancements for syndicate investments. These mechanisms added layers of complexity to the syndicate structure, enticing investors with promises of enhanced returns while maintaining the appearance of legitimacy.

111.    The syndicates began operating almost immediately following the collapse of TradeAI. By November 21, 2023, UA3 had announced its syndicate, and operations were in full swing by December 2023. Several syndicates launched in early December and continued their operations until the system's eventual collapse in late April or early May 2024, marking the end of the broader Ponzi scheme.

112.    On November 21, 2023, UA3 announced the creation of Paddy's Investment Syndicate. The announcement specifies that Jampzer (Defendant Schmidt), Hydraze (Defendant Wood), OXC, and Mr. Wh4le would serve as operational members within the syndicate, and were compensated for their roles. Schmidt and Wood were assigned to the governance team, where they would act as advisors to UA3 and hold additional responsibilities regarding the management of the Smart Contract (a program on the blockchain that would help direct payments between crypto wallets). Members of the OCB team were signatories on UA3's multi-signature wallet, which controlled syndicate funds, and made multiple announcements in their Discord community promoting UA3's profitability.

113.    The parties behind TradeAI and UA3 formed the new entity organized under the law of Dubai called "StakX Artificial Intelligence Developing Services FZCO" on December 1, 2023. The company was jointly owned by Defendants Gharib and UA3.

114.    The UA3 team then sent a letter on December 4, 2023, addressed to Defendant Gharib at StakX, claiming access to a $100 million funding facility intended to fulfill any financial obligations. The letter was signed by Defendant Alyward and included a stamp showing the Cypher Capital Hub address, with Cypher Capital also mentioned in the footer. This document was crafted to create the illusion of an association between UA3 and Cypher Capital, an image that UA3 and Punk Apes had been working to cultivate for nearly six months through various brand associations. However, Cypher Capital later disclosed that UA3 had no association with Cypher Capital, and this document was incorrect.

115.    On January 2, 2024, Defendant Wood (using his screen name, Hydraze) announced on Discord that members of the On Chain Buccaneers will have access to UA3's syndicate, which was known as Paddy's Syndicate. Defendant Wood claimed that trading in the syndicate "in the first 4 weeks delivered circa +10% profits in each period for depositors." OCB members who invest in this syndicate would receive 46% of the trading profits from the pool. Defendant Wood also reassured his community that the "syndicate is asset backed with $15M worth of Banksy art that is owned by Paddy."

116.    Like prior investment vehicles, the maximum allocations were based on the NFTs that each investor held; the rarer the NFT, the higher the allocation. This served to incentivize greater sales of OCB's NFTs. As a result, the UA3 NFTs increased their market price to over 3 ETH (or more than $7,000 USD), which was ten times its original minting price. The Defendants profited from this directly as they held the underlying NFTs and also profited from the royalty payments on secondary market sales.

117.    Similar messages on the OCB Twitter account (@OCBalpha) announced that OCB community members would have "direct access into Paddy's Weekly Trading Syndicate, asset backed by $15M of Banksy art."

118.    On January 4, 2024, Defendant Gharib (using his screen name, DeGen-Stakx), posted an announcement on Discord on behalf of the StakX team that described the differences between several syndicates.  Specifically, Defendant Gharib stated that the UA3 syndicate "is backed by Paddy's art on the 46/54 model with trading done on the low risk strategies."  Other syndicates, such as the "XXX Syndicate," were also backed by Paddy's art, but had different profit share percentages and risk tolerances.

119.    Defendant Wood continued to promote investing in the UA3 syndicate.  For example, on January 5, 2024, he claimed on Discord that the depositors in the prior week's trading session earned 14.58% return.  Since OCB investors only received 46% of the profits, this suggests that the entire syndicate would have had to have earned more than 32% in just one week.



120.    On January 26, 2024, the PunkApe Twitter account (@pxnap3) announced the PunkApe Syndicate and the related PunkApe NFTs as key components of the PunkApe and UA3 ecosystem, stating that holders can earn more passive revenue through their involvement. The announcement emphasizes, "The more you hold, the more you earn."  Several of the Defendants,

including Defendants Wood, Schmidt, Gharib, and McInnes, all received PunkApe NFTs with the "Honorary" trait, illustrating their entanglement with the UA3 team.

121.    After this, several other KOLs began forming their own syndicates for investment in the newly repackaged StakX scheme.

122.    For example, on December 6, 2023, Defendant Cyrus Abrahim announced on Discord the formation of his weekly syndicate, the "Kong Syndicate."  As his post made clear, the funds submitted to the syndicate would be collected in an account on Binance to be traded.  There was a clear expectation of profits from the trading activity that would be paid to the investors.  He explained that 45% of the profits would be paid to the StakX team, 40% would be paid to the depositors, and the rest would go to the treasury for his NFT collection (Jungle Labs) or to holders of the Anarkey NFT (one of the original TradeAI NFTs).  He also predicted "1.6-6% growth a day on average" – or ***11% to 42% returns in just seven days***.



123.    Defendant Abrahim continued to promote on Discord the weekly versions of the syndicate for the next few months.  He continued to advertise outstanding returns in short periods of time, such as 40% to 50% return in a one week period:



124.    Defendant Abrahim also explicitly told his Discord community that he retained control over the funds because he had the "keys" to the accounts because the funds never leave his control:



125.    Defendant Abrahim also promised the investors in his Discord community that the assets in the syndicate were safe because they were "principal protected" with cash from his own Jungle Labs project.   He specifically said that it was not protected by assets from StakX or TradeAI.







126.    Defendant Abrahim also made sure that the investors in his syndicates also purchased the assets that he had control over in order to increase their value.  For example, he required all of the investors in his syndicates to own either his NFTs (i.e., the Supreme Kong NFT, which were sold on the OpenSea.io website at https://opensea.io/collection/supremekong), his crypto tokens (the Jungle Token, sometimes referred to as $JNGL[7]), or some combination of both. Investors had allocations or capped investment amounts based on the amount of these assets that they held.  He also required investors to commit not to sell these assets, keeping them "staked" in their crypto wallets.  On February 12, 2024, he also introduced a new "passive yield" program for the larger holders of his Jungle Token:  For each cycle of the syndicate, 10% of the profits would be withheld and distributed to every investor who held 10,000 Jungle Tokens.

127.    Staking the assets required the investors to commit them and pledge not to sell them into the market.

128.    Defendant Abrahim also ushered other groups of investors into the StakX syndicates under the umbrella of his Supreme Kong and Jungle Labs brand.  The investors in these

---

[7] This token is sold on the Uniswap exchange.
https://app.uniswap.org/explore/tokens/ethereum/0x4c45bbec2ff7810ef4a77ad7bd4757c446fe4155, archived at
https://perma.cc/7KCX-DYRL  Uniswap is headquartered in Brooklyn, New York.

other groups were required to purchase Abrahim's crypto assets, including the $JNGL token.  As a result, the value of Defendant Abrahim's Jungle token increased more than 3,000% in early 2024.

129.    Wallets that did not have a recent history purchasing $JNGL sold a substantial amount of the token at its height.  The most plausible explanation is that insiders, like Defendant Abrahim, took advantage of this situation and liquidated a substantial portion of holdings in the $JNGL token near the peak of their value, prompting their value to plummet.

**The StakX Syndicates Continued to Face Payout Problems and Eventually Failed**

130.    During a Twitter Space on February 17, 2024 to discuss that status of the syndicates and the payouts (https://twitter.com/pxnkap3/status/1758884143297966455), Defendants McInnes and Abrahim reassured investors that, even though there were some delays, the payouts would come in time.  Defendant McInnes specifically said that they had authorized the distribution of more than $18 million USD, but that they could not close out positions early without risking a loss.  Defendant McInnes also claimed that they would create a process where investors who wanted to could exit their position and have their investment bought out.  Furthermore, he stressed that each investor who holds five PunkApe NFTs (a "band") would earn a 5% kickback on the interest earned in the syndicate.  Defendant McInnes also noted that he was discussing with Defendant Wood how to structure the payouts from the syndicates, including whether to require staking.

131.    Defendant Abrahim also contributed to the call, explaining that he and Defendant Gharib had specific trading strategies that required time to develop, such as trying to time the anticipated increase in Bitcoin prices around the Chinese New Year.  He also stressed that they not only wanted to perform well in trading, but that they wanted to "grow the brand" as a business.

132.    The host on the space literally said that Defendant Abrahim's reassurances would put people's minds at ease for any concerns over the investments.

133.    On March 10, 2024, Defendants Gharib and McInnes issued an official StakX statement titled "Fund Structure Changes and KYC/AML Alerts Announcement." The document outlined several measures to enable StakX to "acquir[e] its funding license—a top tier license for fund management."  Included in these steps was a change to an enterprise account at Binance in order to supposedly prevent the freezing of assets.  Even though the UA3 team was brought on to make the business more professional several months prior, the announcement claimed that they need to "formally structure[e] our organizations and operations."  However, there is no evidence that any of these steps were ever taken.

134.    The system continued to experience delays in payments to investors.  In order to lessen concerns, Defendant McInnes issued a statement on March 11, 2024 that StakX had entered a partnership with a "well-known venture capitalist firm," which would purportedly offer liquidity options to holders needing to close their backlog positions early. However, the identity of this firm was never disclosed.

135.    On March 29, 2024, the StakX backlog of non-payments problem still had not been solved, and Defendants McInnes and Gharib joined others on an AMA call to address these concerns.  Instead of detailing how they would be able to return the investors' money, the Defendants blamed the KYC and AML requirements that were delaying the process.  When one community member asked about his own situation around the 51st minute, he stated that he submitted a passport for the KYC process and that his AML score was good.  Meanwhile, he was "in the red," and had about $60,000 in past payments that were due to him.  The community member explained that he needed the cash "pretty desperately at this point" and "as quickly as possible." Instead of explaining why he had not been paid or when he would be paid, the Defendants told him to file a support ticket on the system.

136. In an effort to redirect the attention of the frustrated investors, the StakX team instead focused on yet another incarnation of their trading scheme, which they were referring to as investment "pods." Defendant Gharib told the audience that "It's crazy that theres some amazing stuff coming, guys. It is."

137. Everything ground to a halt in early April 2024. On April 9, 2024, the StakX team announced the details to the new approach to addressing outstanding payments. Instead of providing direct cash repayments, they offered investors alternative assets, such as "pods" or similar instruments, as substitutes for the owed funds. This strategy mirrors a previous incident in October 2023, when, facing payment failures in TradeAI, the team proposed offering liquidity in the form of BeAI tokens instead of cash repayments. Both instances involve substituting tangible repayments with alternative assets, which may lack inherent value, raising concerns about the legitimacy and value of these substitutes.

138. By the next day, Defendant Wood was actively trying to distance himself from StakX and any involvement with the scheme. In a message on Discord, Defendant Wood claimed that he had nothing to do with getting UA3 involved with TradeAI. He also claimed that, despite being on the "governance team" for the UA3 syndicates, he had "zero visibility" into the accounts and that the team was moved to Costa Rica.

139. On April 11, 2024, a representative from Cypher Capital Group in Dubai posted on Twitter that the letter from UA3, which offered $100 million in funding (see paragraph 114), incorrectly claimed to be associated with Cypher Capital Group.

140. Further repayments of money—either invested capital or supposed gains—stopped and the Plaintiffs have not recovered further.

141.    There is no indication that Defendant Gharib and others who supposedly conducted trading on the funds received in the TradeAI and StakX schemes actually achieved anywhere near their unbelievable returns.  A review of more than one million transactions related to these accounts was conducted in May 2024.  The conclusion reached from this limited review was that the accounts actually ***lost more than $4 million USD*** through trading losses and transaction fees.

142.    The only way that payments and profits were paid out to investors was through the receipt of new money from subsequent investors in a classic Ponzi scheme.

143.    In fact, as Plaintiff McGuire posted on Twitter, Defendant Gharib admitted to him that the TradeAI and StakX were Ponzi schemes:



**The Securities Subject to Regulation Under the Securities Act**

144.    Section 2(1) of the Securities Act defines the term "security" to mean:

any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or

other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1).

145.    An "investment contract" includes transactions involving an investment of money in a common enterprise with the expectation of profits to come from the efforts of others.

146.    The NFTs and other digital assets such as the Jungle Token issued by Defendant Abrahim that provided access to the TradeAI investment pools or to the StakX syndicates (the "NFT Securities") and the TradeAI investment pools and StakX syndicates (the "Investment Vehicle Securities"; collectively with the NFT Securities, the "Securities") are investment contracts, and are therefore securities subject to regulation under the Securities Act.

<u>The Securities Involved a Common Enterprise</u>

147.    The Securities involve a common enterprise because they concern a sharing or pooling of the funds of investors, and the fortunes of each investor in the pool of investors are tied to one another and to the success of the investment pool. The sale of the Securities was used by the Defendants to secure financial investment from the public, including Plaintiffs, for the purpose of funding the TradeAI and StakX supposed trading activities.

148.    The pooling of investor assets in order for Defendant Gharib and others to invest and share profits created a shared outcome between the investors and the investment pool. These initiatives were positioned to drive up the value of the Securities, providing profits to the investors including Plaintiffs.

149.    For example, the value of the OCB related NFTs increased during the greatest periods of both the TradeAI and StakX activity:



150.    In line with this, once Defendant Abrahim began actively promoting the StakX syndicates and requiring his community members to hold Supreme Kong NFTs and Jungle tokens, the prices of his Supreme Kong NFTs skyrocketed:



151.    The Securities also involved a common enterprise because the fortunes of the investors in the Securities, including Plaintiffs, were tied to the supposed investments in the pools and syndicates. The potential returns for investors were directly tied to the success of these initiatives, which would, in turn, increase the value of the Securities. Without the efforts of the promoters, appreciation in the value of the Securities could not be realized.

152.    As such, the sale of Securities involved a common enterprise.

<u>The Securities Were Sold and Purchased With the Expectation of Profits from the Efforts of Others</u>

153.    The Securities were sold and purchased with the expectation of profits to come from the efforts of the Defendants and others.

154.    The Defendants' promotional, marketing, and solicitation activities fostered a reasonable belief among investors that they would receive profits.  They explicitly touted the expected yields and returns form the investment pools and later syndicates—they were often in the

names of the pools.  Defendants also promoted the expected appreciation of the NFT Securities, including highlighting the profits that they made by "flipping" NFTs.  Defendants also promoted the "passive income" properties of the NFT Securities, including especially the Anarkey NFTs which allowed holders to receive a portion of the overall profits of the investment pools.

155.    The generation of profits for Securities holders was fundamentally dependent on the continued efforts of the supposedly exceptionally gifted trading skills of Defendant Gharib and others, including Defendant Abrahim.

156.    As such, profits for the Securities were to be derived solely from the efforts of others.

<u>The Sale and Purchase of the Securities Took Place in the United States</u>

157.    The Securities were sold in part through OpenSea, a prominent NFT marketplace, which is headquartered in the United States. Defendants also promoted the Securities extensively through online platforms that are based in the United States, such as Discord, Twitter, and websites that are hosted or administered in the United States.

158.    Defendant Abrahim is a resident of the United States.

159.    Defendants actively marketed the scheme to the United States and took no efforts to avoid selling into the United States.  Many of the Plaintiffs are residents of the United States.

## CAUSES OF ACTION

### COUNT I

**For Violations of Sections 5 and 12(a)(1) of the Securities Act**

**Against All Defendants**

160.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

161.    This Count is asserted against all Defendants, and is based upon Sections 5 and 12(a)(1) of the Securities Act.

162.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

163.     For purposes of asserting this Count, Plaintiffs do not allege that the Defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(1) claim.

164.    The Securities are and were securities as defined by the Securities Act.

165.    Unless a registration statement is in effect with respect to a security, Section 5(a) of the Securities Act makes it unlawful for any person:

> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a).

166.    Section 5(c) also makes it unlawful for any person "to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security." 15 U.S.C. § 77e(a).

167.    A registration statement has never has been in effect, or even filed, to register the Securities with the SEC.

168.    The sales and solicitations of these Securities were conducted through the internet, a means of interstate communication. For example, the Defendants extensively discussed all stages

of the scheme—from recruiting members to their communities, encouraging them to invest, updating them on performance, and tracking performance concerns—on platforms such as Discord across state lines and internationally, all without registering the Securities with the SEC. This constitutes a clear violation of 15 U.S.C. § 77e(a).

169.    Section 12(a)(1) of the Securities Act provides that any person who sells a security in violation of Section 5 is liable to:

> the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(1).

170.    A person is liable under Section 12(a)(1) of the Securities Act if that person is a statutory seller, defined as a person who (1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of securities, so long as the person is motivated at least in part by a desire to serve his, her, or its own financial interests or those of the security's owner.

171.    The Defendants passed title to the Securities related to the StakX syndicates starting on or about December 8, 2023, making them statutory sellers with regard to those sales.

172.    Further, the Defendants and/or their agents made numerous public statements touting the Securities, their potential for profit, and encouraging the purchase of the Securities. As such these defendants solicited the purchase of the Securities for their own financial interest.

173.    The statute of limitations for claims under Section 12(a)(1) is one year from purchase or delivery, whichever is later.

174.    The investments in the StakX syndicates began on or about December 8, 2023.  All sales of the NFT Securities and Investment Vehicle Securities since that time are timely.

175.    The Defendants are statutory sellers because they sold, promoted, or solicited the exchange of the Securities and/or passed title to the Securities to Plaintiffs for their own financial benefit.  These Defendants received significant financial compensation from the sales of the NFT Securities, the "tax" that they received from investments in the TradeAI pools, their retention of the supposed yields, and their retention of the unreturned funds when the project stopped operating.

176.    Defendants are therefore liable to Plaintiffs for rescissory damages for Plaintiffs' purchases of the Securities in an amount to be determined at trial.

177.    Plaintiffs hereby tenders their Securities back to the Defendants.

## <u>COUNT II</u>

### For Violations of Section 12(a)(2) of the Securities Act

### Against Defendants

178.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

179.    This Count is asserted against Defendants, and is based upon 12(a)(2) of the Securities Act.

180.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.    For purposes of asserting this Count, Plaintiffs do not allege that the Defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

181.    Section 12(a)(2) of the Securities Act provides that:

Any person who…offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the

statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

182.    The Securities are, and were, securities as defined by the Securities Act.  These Securities were not registered as securities with the SEC.

183.    From early 2023 through April 2024, in connection with the offer and sale of the Securities, Defendants unlawfully made statements on the Internet, including Discord, X (formerly Twitter), and other social media channels that constitute as prospectuses or oral communications within the scope of the Securities Act.

184.    Defendants made numerous untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading in subject matters related to the TradeAI and StakX scheme.

185.    The statements made contained untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading.  Not only were these statements untrue or misleading when made, but Defendants did not correct them by the date of the individual purchases by Plaintiffs, and thus the statements were untrue or misleading as of the date of the individual purchases.

186.    Specifically, Defendants repeatedly encouraged Plaintiffs to invest in the Securities because of the supposed profits being earned through successful trading conducted by Defendant Gharib and others, including Defendant Abrahim.  However, Defendants did not disclose that the trading activity was not actually generating these remarkable returns.

187.    Defendants did not disclose that the true source of the supposed profits or yields was actually the investments made by other participants in a classic Ponzi scheme.

188.    Defendants explained the inability to repay investments and the growing backlog of claims by a variety of different excuses, including that the payments were frozen by Binance, the KYC and AMA procedures were ongoing, or simple technological mistakes that resulted from being too successful and growing too fast.  However, Defendants never explained the truth that the payments were unavailable due to the lack of investment performance.

189.    In reality, these statements were false and misleading because at the time they were made and at the time the Securities were sold.  Notably, Defendants failed to disclose critical financial information that would appraise investors of the falsity of these statements and, in fact, failed to disclose any financial information about the business whatsoever.

190.    The Defendants are statutory sellers because they sold, promoted, or solicited the exchange of the Securities and/or passed title to the Securities to Plaintiffs for their own financial benefit.  These Defendants received significant financial compensation from the sales of the NFT Securities, the "tax" that they received from investments in the TradeAI pools, their retention of the supposed yields, and their retention of the unreturned funds when the project stopped operating.

191.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the communications and within three years of when the Securities were sold to the public.  It became clear that Defendants were operating a Ponzi scam when the music stopped sometime on or after April 2024.  Defendants provided a rotating array of explanations, misdirection, and excuses for why the funds were not returned, and reassured the Plaintiffs through pleas for patience and community that they were trying to fix the problems.  Several Defendants have tried to portray themselves as victims, distancing their own role in perpetrating this scheme.

Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions at an earlier time.

192.    By reasons of the foregoing, the Defendants are therefore liable for violations of Section 12(a)(2) of the Securities Act to the Plaintiffs for Plaintiffs' purchases of the Securities pursuant to Defendants' false and misleading prospectuses and communications.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

A.    Awarding Plaintiffs damages in an amount that may be proven at trial, together with interest thereon;

B.    Ordering disgorgement of Defendants' unjust enrichment;

C.    Awarding Plaintiffs rescissory damages;

D.    Awarding Plaintiffs fees, expense, and costs;

E.    Awarding Plaintiffs pre-judgment and post-judgment interest; and

F.    Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs requests a trial by jury of all claims that can be so tried.

Dated: December 9, 2024                Respectfully submitted,

**WOLF POPPER LLP**

By:    /s/ Chet B. Waldman
      Chet B. Waldman

Chet B. Waldman
Matthew Insley-Pruitt
Terrence Zhang
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: (212) 759-4600

Email: cwaldman@wolfpopper.com
       minsley-pruitt@wolfpopper.com
       tzhang@wolfpopper.com

*Attorneys for Plaintiffs*

Max Burwick (*Pro Hac Vice* application forthcoming)
BURWICK LAW, PLLC
43 West 43rd Street, Suite 114
New York, NY 10036
Email: max@burwick.law

*Attorneys for Plaintiffs*